UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>UNITED WESTERN BANCORP, INC.<br><br>Debtor. | Case No. 12-13815 TBM<br>Chapter 7 |
| SIMON E. RODRIGUEZ, in his capacity as Chapter 7 Trustee for the bankruptcy estate of United Western Bancorp, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Receiver of United Western Bank,<br><br>Defendant. | Adv. Pro. No. 14-1191 TBM |

**OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Everyone wants a tax refund — especially a tax refund of $4,081,335. That is the amount that the Internal Revenue Service agreed should be returned (the "Tax Refund") based upon the offset of net operating losses and past income from the operations of United Western Bank (the "Bank"), a failed Colorado financial institution currently in receivership under the watchful eye of the Federal Deposit Insurance Corporation (the "FDIC"). But, even though the Tax Refund indisputably stems from the Bank's business loss carrybacks, entitlement to the Tax Refund is complicated by virtue of how the Bank filed its federal income tax returns. Prior to being closed by the Office of Thrift Supervision, the Bank joined with its parent bank holding company, United Western Bancorp, Inc. ("UW Bancorp"), and certain other affiliated entities to form a consolidated group for federal income tax purposes. As the parent bank holding company, UW Bancorp filed consolidated federal income tax returns for the entire corporate group pursuant to a tax allocation agreement. The bank holding company corporate structure and federal income tax consolidation utilized by UW Bancorp and its subsidiaries are common in the banking industry — but also inadvertently created the legal conundrum posed by this case.

Closure of the Bank by federal regulators ultimately caused its parent, UW Bancorp, to fail too. UW Bancorp filed for protection under Chapter 11 of the Bankruptcy Code. Later, this Court converted the bankruptcy reorganization case to a Chapter 7 liquidation and Simon E. Rodriguez was appointed as the Chapter 7 Trustee (the "Trustee") for UW Bancorp. After learning of the

anticipated Tax Refund, the Trustee (acting on behalf of the UW Bancorp estate) filed this adversary proceeding against the FDIC (acting as receiver of the Bank). The Trustee claims that the Tax Refund is property of the UW Bancorp bankruptcy estate. The FDIC counters that the Tax Refund belongs to the Bank. Both sides contend that the underlying facts are undisputed and the contest can be decided as a matter of law. Given the competing claims to the Tax Refund, the IRS recently deposited the $4,081,335 Tax Refund into the Registry of this Court where it waits pending final adjudication of the legal dispute. Ultimately, the case boils down to this simple-sounding binary question: Which party (the Trustee or the FDIC) is entitled to the Tax Refund?

## I.      Jurisdiction and Venue.

### A.      Nature of the Case.

On April 16, 2014, the Trustee initiated this adversary proceeding by filing his "Complaint Asserting Objection to Claim and Counterclaims for Declaratory Relief and Recovery of Assets of the Estate." (Docket No. 1, the "Complaint.") The Trustee purports to act "in his capacity as Trustee for the bankruptcy estate of United Western Bancorp, Inc.," while suing the FDIC "in its capacity as Receiver for United Western Bank." (*Id*. at 1.) The fundamental claim asserted in the Complaint is for declaratory judgment under Section 541[1] of the Bankruptcy Code and 28 U.S.C. § 2201. Noting the "actual, real and immediate controversy" concerning entitlement to the Tax Refund, the Trustee requests that this Court enter a declaratory judgment determining that the Tax Refund is property of the bankruptcy estate of UW Bancorp. (*Id*. at 4-5.) From this premise, the Trustee added two subsidiary causes of action. First, the Trustee demands that the Tax Refund be turned over to him under Section 542, because the Tax Refund is property of the estate. Second, the Trustee objects to the FDIC's proof of claim against UW Bancorp under Section 502(b) because the proof of claim had asserted that the FDIC (not the Trustee) was entitled to the Tax Refund. The Trustee asserts that the FDIC's proof of claim should be disallowed "except to the extent that it presents a non-priority, general unsecured pre-petition claim" against UW Bancorp. (*Id*. at 5.) So, although three claims are asserted by the Trustee in the Complaint, all of which are uniquely based on the Bankruptcy Code, they all depend on whether or not the Tax Refund is property of the estate of UW Bancorp.

The FDIC contested the Complaint through its "Answer and Counterclaim." (Docket No. 25, the "Answer.") In addition to denying the Trustee's claims and asserting various affirmative defenses, the FDIC stated a counterclaim. (*Id*. at 20.) But the FDIC's counterclaim is merely the mirror-image of the Trustee's declaratory judgment cause of action. The FDIC asserts that the Tax Refund is its property (as receiver for the Bank) and should be turned over to the FDIC. (*Id.*)

### B.      Jurisdiction and Venue.

Based upon the nature of the Complaint, this Court would appear to have jurisdiction to enter final judgment on all of the claims advanced by the Trustee and the FDIC's counterclaim pursuant to 28 U.S.C. § 1334(b). Furthermore, all of the Trustee's claims are core proceedings under 28 U.S.C. § 157(b)(2)(A) ("matters concerning administration of the estate"), (b)(2)(B)

---

[1]      Unless otherwise indicated, all references to "Section" are to Sections of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et. seq.*

("allowance or disallowance of claims against the estate"), (b)(2)(C) ("counterclaims by the estate"), (b)(2)(E) ("orders to turn over property of the estate"), and (b)(2)(O) ("other proceedings affecting liquidation of the assets of the estate").

But, there was an initial jurisdictional hiccup. The FDIC is an independent agency of the United States government. 12 U.S.C. §§ 1811(a) (establishment of FDIC) and 1819 (the FDIC "shall be an agency of the United States"). The FDIC has two main missions: (1) to act as an insurer or regulator of banks and savings associations; and (2) when appointed as a receiver, to liquidate failed banks and savings associations. *Id.*; 12 U.S.C. §§ 1811(b), 1814-1822, and 1828. And, as an agency of the United States government, the FDIC enjoys special statutory protections and privileges including federal jurisdiction in the district courts. 12 U.S.C. § 1819(b). Relying primarily on 12 U.S.C. §§ 1819(b) and 1821(d), the FDIC initially asserted its special status and challenged this Court's subject matter jurisdiction to adjudicate the claims and counterclaims and enter final judgment. (Docket No. 25 at 1, 2, and 15.)

Thus, the FDIC's defenses raised complicated jurisdictional issues involving constitutional law and statutory interpretation. Most courts considering such matters have determined that bankruptcy courts do have jurisdiction to fully and finally adjudicate the types of claims asserted by the Trustee. *See Zucker v. FDIC (In re BankUnited Fin. Corp.)*, 727 F.3d 1100, 1104 n.5 (11th Cir. 2013) ("Section 1821(d)(13)(D)... does not preclude the Bankruptcy Court from determining the threshold question of whether tax refunds are an asset of the bankruptcy estate."); *Giuliano v. FDIC (In re Downey Fin. Corp.)*, 499 B.R. 439 (Bankr. D. Del. 2013), *aff'd Cantor v. FDIC (In re Downey Fin. Corp.)*, 593 Fed. Appx. 123 (3rd Cir. 2015) (unpublished) (bankruptcy court entered final judgment on Chapter 7 trustee's claims against FDIC related to disputed tax refund; appellate court held: "The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. § 157."). And, filing a proof of claim (as the FDIC did) ordinarily submits the claimant to the "equitable jurisdiction of the Bankruptcy Court" — at least with respect to issues concerning adjudication of the proof of claim. *Langenkamp v. Culp*, 498 U.S. 42, 44 (1991); *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58 (1989).

Fortunately, the Court need not delve too deeply into the jurisdictional abyss since the FDIC changed its position. On December 15, 2015, the FDIC filed a "Statement of Position" wherein the FDIC stated unequivocally that the FDIC "withdraws its jurisdictional reservations" and "consents to entry of final orders or judgment by the Bankruptcy Court in this adversary proceeding." (Docket No. 53.) The FDIC also withdrew its affirmative defenses based upon its jurisdictional arguments. (*Id.*) The FDIC's express, knowing, and voluntary consent to final adjudication by this Court is sufficient for this Court to exercise jurisdiction and issue a final judgment. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1947 (2015) ("Adjudication based upon litigant consent has been a consistent feature of the federal court system since its inception.").

Based upon the Court's own jurisdictional assessment coupled with the FDIC's express consent, the Court determines that it has jurisdiction to enter final judgment on all of the claims advanced by the Trustee and the FDIC's counterclaim pursuant to 28 U.S.C. § 1334(b). All of the Trustee's claims are core proceedings under 28 U.S.C. § 157(b)(2). Further, venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.      Procedural Background.

### A.      The Main Case.

UW Bancorp filed for protection under Chapter 11 of the Bankruptcy Code on March 2, 2012 in the case captioned: *In re United Western Bancorp, Inc.*, Case No. 12-13815 (Bankr. D. Colo.) (the "Main Case"). (Main Case Docket No. 1.) A little over a year later, on April 15, 2013, the Court entered its "Order Converting Case Under Chapter 11 to Case Under Chapter 7." (Main Case Docket No. 290.) Promptly after the conversion, Simon E. Rodriguez was appointed as the Chapter 7 Trustee and has remained in that role continuously thereafter. (Main Case Docket No. 291.)

### B.      The Adversary Proceeding.

The Trustee initiated this adversary proceeding by filing the Complaint against the FDIC on April 16, 2014. The FDIC responded with the Answer. The core dispute framed by both the Complaint and the Answer is whether the Tax Refund is property of the UW Bancorp bankruptcy estate or, alternatively, whether the Tax Refund belongs to the FDIC as receiver for the Bank. The $4,081,334 Tax Refund already has been deposited into this Court's Registry pending the entry of judgment in this adversary proceeding. (Main Case Docket No. 529.)

### C.      The Cross Motions for Summary Judgment.

Both the Chapter 7 Trustee and the FDIC agree that this case should be decided by summary judgment under Fed. R. Civ. P. 56, as incorporated by Fed. R. Bankr. P. 7056. The FDIC struck first and submitted its "Motion for Summary Judgment" (the "FDIC MSJ") and "Memorandum of Law in Support of Motion for Summary Judgment" (the "FDIC Memorandum"). (Docket Nos. 39 and 40.) The Trustee responded in opposition to the FDIC MSJ. (Docket No. 47.) And, after receiving Court authorization, the FDIC replied in support of the FDIC MSJ. (Docket No. 52.)

Meanwhile, the same day that the FDIC filed the FDIC MSJ, the Trustee filed his own "Motion for Summary Judgment" (the "Trustee MSJ") and "Brief in Support of Plaintiff's Motion for Summary Judgment" (the "Trustee Memorandum"). (Docket Nos. 44 and 45.) The FDIC responded in opposition to the Trustee MSJ. (Docket No. 48.) And, after receiving Court authorization, the Trustee replied in support of the Trustee MSJ. (Docket No. 54.) The FDIC MSJ and the Trustee MSJ are effectively inverse images of each other. Each party requests that the Court enter summary judgment in its favor determining entitlement to the Tax Refund.

The Trustee's principal argument is that a "Tax Allocation Agreement," dated January 1, 2008 (the "TAA"), created a debtor-creditor relationship as between UW Bancorp and the Bank. The Trustee contends that the UW Bancorp bankruptcy estate owns the Tax Refund under the TAA but acknowledges that the Bank is entitled to a general unsecured claim against the UW Bancorp bankruptcy estate for some or all of the Tax Refund, which should share only *pari passu* with other general unsecured claims against UW Bancorp.

4

Contrawise, the FDIC urges that it owns the Tax Refund (as receiver for the Bank) because UW Bancorp allegedly was only a conduit for the Tax Refund. Further, the FDIC argues that the TAA established an agency relationship (not a debtor-creditor relationship) as UW Bancorp and the Bank, whereby UW Bancorp is merely an intermediary between the IRS and the Bank with respect to tax matters. Alternatively, the FDIC suggests if the TAA is silent as to ownership of the Tax Refund, then the Tax Refund should be awarded to the FDIC because the Bank alone generated the income and net operating losses resulting in the Tax Refund.

Thus, both the Trustee and the FDIC focus on the terms and meaning of the TAA. Suffice to say that both the FDIC and the Trustee submitted thorough, professional, and persuasive arguments in support of their respective opposing positions. The parties complied with all of the requirements of L.B.R. 7056-1. The Court commends the work of legal counsel for both sides of the dispute. The matters are fully briefed. Further, the Court conducted a lengthy hearing to receive additional oral argument concerning the FDIC MSJ, the Trustee MSJ, and the respective oppositions. The very challenging issues presented by the Trustee and the FDIC are ripe for decision.

### III.   Findings of Fact.

It is axiomatic that summary judgment may not enter unless the movant "shows that there is no genuine dispute as to any material facts and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this case, the parties agree on virtually all the basic material facts but contest the legal implications.[2] Thus, this case is especially suited for the entry of summary judgment without the necessity of a contested trial. For purposes of both the FDIC MSJ and the Trustee MSJ, the Court finds that the following material facts are undisputed and accepted:[3]

### A.   UW Bancorp and the Bank.

UW Bancorp was a bank holding company.[4] UW Bancorp's principal wholly-owned subsidiary was the Bank.[5] The Bank operated a community-based banking network, comprised of

---

[2]     For example, in the FDIC MSJ, the FDIC identified 29 alleged undisputed material facts. (FDIC Memorandum at 4-8.) The Trustee took exception to only one of the FDIC's alleged undisputed material facts. (Docket No. 47.) But that dispute was only about characterization of the TAA, a document upon which both parties rely. Similarly, in the Trustee MSJ, the Trustee identified seven alleged undisputed material facts. (Trustee Memorandum at 2-4.) Most of the alleged undisputed material facts advanced by the Trustee overlapped with the almost simultaneous submission by the FDIC. And, the FDIC did not dispute the actual underlying facts. Instead, the few objections made by the FDIC to the alleged undisputed material facts proposed by the Trustee focused on the materiality, relevance, and characterization of some of the undisputed material facts. (Docket No. 48.) Under L.B.R. 7056-1, all proposed undisputed material facts advanced by a movant are deemed admitted unless specifically controverted. So, given the foregoing, the bottom line is that the parties agree on the core facts.

[3]     The Court identifies only the undisputed facts that the Court deems to be relevant and material (except for procedural facts identified previously). The parties also have proposed that certain passages from the TAA be deemed as undisputed material facts. The terms of the TAA are undisputed and will be noted as appropriate through this Opinion and Order.

[4]     Complaint ¶ 15; Answer ¶ 15; FDIC Undisputed Fact No. 3.

[5]     Complaint ¶¶ 12 and 15; Answer ¶¶ 12 and 15; FDIC Undisputed Fact No. 4.

eight banking locations and a loan servicing office, across Colorado's Front Range market and selected mountain communities.[6]

**B.      The FDIC Receivership of the Bank.**

On January 21, 2011, the Office of Thrift Supervision closed the Bank and appointed the FDIC as receiver.[7]  Upon its appointment, the FDIC succeeded to the rights, titles, powers, and privileges of the Bank, and the FDIC is empowered, among other things, to take over assets of and operate the Bank, collect all obligations and money due to the Bank, preserve and conserve the assets and property of the Bank, and place the Bank in liquidation and proceed to realize upon its assets.[8]

**C.      The UW Bancorp Bankruptcy.**

After the Bank was placed into FDIC receivership, UW Bancorp filed for protection under Chapter 11 of the Bankruptcy Code in the Main Case.[9]  Subsequently, this Court converted the case to a liquidation under Chapter 7 and Simon E. Rodriguez was appointed as the Chapter 7 Trustee.[10]  The FDIC filed a protective proof of claim (Claim 28-1, the "FDIC Claim") against UW Bancorp in the Main Case in the amount of $4,847,000 asserting, *inter alia*,[11] a claim of ownership in the Tax Refund.[12]

**D.      The Tax Allocation Agreement, Consolidated Tax Returns, and Tax Refund.**

Prior to the Bank being placed into FDIC receivership and UW Bancorp filing for bankruptcy protection, UW Bancorp and its 13 affiliated subsidiaries (the "Affiliates"), including the Bank, were  members of an "affiliated group" for tax purposes within the meaning of Section 1504(a) the Internal Revenue Code, 26 U.S.C. § 1 *et seq.* (the "Affiliated Group").[13]  The Affiliated Group, including UW Bancorp and the Bank, entered into the TAA (Tax Allocation Agreement), dated January 1, 2008.[14]

UW Bancorp filed consolidated federal income tax returns as agent for and on behalf of itself and its subsidiaries (including the Bank), pursuant to the TAA.[15]  In accordance with the TAA, the parties computed the tax liabilities and tax benefits on a separate-entity basis for each

---

[6]      FDIC Undisputed Fact No. 4 and FDIC Exhibit B.
[7]      Complaint ¶ 11; Answer ¶ 11; FDIC Undisputed Fact No. 5; FDIC Exhibit B.  A federally-insured bank may not be a debtor under the Bankruptcy Code.  11 U.S.C. § 109(b)(2) and (d).  Thus, bank liquidations generally are conducted under the supervision of the FDIC.
[8]      FDIC Undisputed Fact No. 6.
[9]      Main Case Docket No. 1; Complaint ¶ 7; Answer ¶ 7; FDIC Undisputed Fact No. 7.
[10]     Main Case Docket Nos. 290 and 291; Complaint ¶¶ 8-9; Answer ¶ 8-9; FDIC Undisputed Fact Nos. 7-8.
[11]     In the FDIC's "Statement of Position," it withdrew its claims asserted in Sections C, D, and E of the FDIC Claim.  (Docket No. 53.)  Thus, the only remaining claim in the FDIC Claim is to the Tax Refund.
[12]     Complaint ¶ 13 and Exhibit A; Answer ¶ 13; FDIC Undisputed Fact No. 23
[13]     Complaint ¶ 16; Answer ¶ 16; FDIC Undisputed Fact No. 9.
[14]     Complaint ¶ 17 and Exhibit B; Answer ¶ 17; FDIC Undisputed Fact No. 10; Trustee Undisputed Fact No. 1. Copies of the TAA are attached as Exhibit B to the "Notice of Filing of Exhibits to Complaint" filed by the Trustee (Docket No. 17), Exhibit A to the Trustee Memorandum, and Exhibit C to the FDIC Memorandum.
[15]     Complaint ¶¶ 17-18 and 24; Answer ¶ 17-18 and 24; FDIC Undisputed Fact No. 11; Trustee Undisputed Fact No. 3.

Affiliate of UW Bancorp, although the federal income tax returns filed with the IRS were on a consolidated basis.[16]

For the tax year 2008, UW Bancorp filed a consolidated federal income tax return for the Affiliated Group and reported that the Bank generated $34,397,709 in taxable income.[17] By contrast, UW Bancorp did not generate any taxable income in 2008.[18] In 2010, the Bank suffered at least $35,351,690 in net operating losses.[19]

Based upon the Bank's 2010 net operating losses, the Affiliated Group filed a tax refund request for $4,846,625 to recover a portion of the taxes paid by the Bank on its 2008 taxable income.[20] In other words, the Affiliated Group sought a loss carryback tax refund — an offset of the Bank's 2010 net operating losses against the Bank's 2008 income. The amount ultimately refunded by the IRS was less than the amount requested. The $4,081,334 Tax Refund has been deposited into this Court's Registry pending the entry of judgment in this adversary proceeding.[21]

## IV.   The Tax Allocation Agreement.

On January 1, 2008, UW Bancorp (the bank holding company corporate parent) and all of its 13 subsidiary Affiliates, including the Bank, entered into the TAA.[22] The parties recited that they entered into the TAA for the following purposes:

> … to establish a method for (i) *allocating* the consolidated tax liability of the Group among its members, (ii) *reimbursing* [UW Bancorp] for the payment of such tax liability, and (iii) *compensating* each member of the Group for the use of its losses by any other member of the Group.

TAA at Second Preamble (emphasis added). This expression of intention is similar to many tax sharing agreements. *See Downey Fin.*, 499 B.R. at 447 (tax sharing agreement utilizing almost identical intention language). The TAA also states that "[t]he intent of this Agreement is to provide an equitable allocation of the tax liability of the Group among UWBI [UW Bancorp] and the Affiliates. Any ambiguity in the interpretation hereof shall be resolved, with a view to effectuating such intent, in favor of any insured depository institution." TAA § H.4.

The TAA creates a system of payment obligations between UW Bancorp and the Affiliates. The heart of the TAA is contained in Section A "General Rules – Federal" which provides:

> Except as specifically set forth herein to the contrary, each Affiliate shall pay UWBI [UW Bancorp] an amount equal to the federal

---

[16]   FDIC Undisputed Fact No. 14; FDIC Memorandum Exhibit D.
[17]   FDIC Undisputed Fact No. 17; FDIC Memorandum Exhibit D.
[18]   FDIC Undisputed Fact No. 18; FDIC Memorandum Exhibit D.
[19]   FDIC Undisputed Fact No. 19; FDIC Memorandum Exhibit D.
[20]   FDIC Undisputed Fact No. 20; FDIC Memorandum Exhibit D.
[21]   Main Case Docket No. 529. The Tax Refund was deposited with this Court's Registry after the FDIC MSJ and the Trustee's MSJ were filed.
[22]   Although the operative agreement in this case is a "Tax Allocation Agreement," similar such agreements frequently are labelled as "Tax Sharing Agreements."

income tax liability such Affiliate would have incurred were it to file a separate return (or, if appropriate, a consolidated return with its subsidiary affiliates).  If a regulated first-tier Affiliate [the Bank] incurs a net operating loss or excess tax credits, the regulated Affiliate is entitled to a refund equal to the amount that it would have been entitled to receive had it not joined in the filing of a consolidated return with UWBI.  Similar treatment is optional at UWBI discretion for nonregulated first-tier Affiliates.  Any refund shall generally not exceed the amount claimed or received as a refund resulting from a carryback claim filed by UWBI.  However, this shall not prevent UWBI from the ability to make a refund over the amount received or claimed as a refund or carryback, if in its sole discretion it believes such payment is in its best interest.

TAA § A.1.

Section A also characterizes the relationship between the parties:

In essence, this Agreement requires that each first-tier subsidiary [the Bank] be treated as a separate taxpayer with UWBI [UW Bancorp] merely being an intermediary between an Affiliate and the Internal Revenue Service ("IRS").

TAA § A.2.  In language mimicking the requirements of an IRS regulation (26 C.F.R. § 1.1502-77(a)), the TAA also confirms the "intermediary" concept and states:

Each Affiliate hereby appoints UWBI [UW Bancorp] as its agent, as long as such Affiliate is a member of the UWBI group, for the purpose of filing such consolidated Federal Income tax returns for the UWBI group as UWBI may elect to file and making any election, application or taking any action in connection therewith on behalf of the Affiliates.  Each such Affiliate hereby consents to the filing of any such returns and the making of any such elections and applications.

TAA § G.1.

The TAA contemplates that UW Bancorp pay to the IRS the consolidated income tax of the Affiliated Group.  In order to do so, the TAA requires the Affiliates to pay UW Bancorp annual "preliminary tax settlement payments" before the April 15 deadline for the consolidated federal income tax return:

Preliminary tax settlement payments are due on or before March 15 following the end of the appropriate taxable year.  Although overpayments of estimated taxes made by Affiliates are not refunded until final tax settlement is done, an Affiliate with a taxable loss for the year may recover estimated taxes paid for that year before final

8

> settlement if an "expedited refund" claim is filed with UWBI [UW Bancorp] by February 15 following the end of the tax year.

TAA § E.1.  The TAA also has a mechanism for final annual calculations and true-up within the Affiliated Group after the payment of annual estimated taxes:

> Each first-tier Affiliate shall compute its final tax settlement liability based upon the amounts included for that Affiliate… in the consolidated federal income tax return filed.  A copy of such computation will be prepared by October 31, and any differences shall be resolved.  Final tax settlement payments or refunds are due on or before November 15.

TAA § E.2.  Similar TAA provisions required further quarterly payments of "hypothetical estimated income tax" to UW Bancorp by the Affiliates.  TAA § F.1 and 2.  But payments by UW Bancorp to an Affiliate relating to possible net operating losses by an Affiliate were required only annually, not quarterly:  "Payments to an Affiliate for net operating losses or similar items shall not be made under this provision, but rather on an annual basis pursuant to Section A."  TAA § F.3.

> The TAA contains a provision regarding refunds from the IRS:

> In the event of any adjustment to the tax returns of the Group as filed (by reason of an amended return, claim for refund, or an audit by a taxing authority), the liability of the parties to this Agreement shall be re-determined to give effect to any such adjustment as if it had been made as part of the original computation of tax liability, and payments between the appropriate parties shall be made within 10 business days after any such payments are made or refunds are received, or, in the case of contested proceedings, within 10 business days after a final determination of the contest.

TAA § H.1.  The Section H.1 text about refunds is additional to other language concerning refunds contained in Sections A.1, E.1 and E.2 of the TAA.

> The TAA vests UW Bancorp with broad authority concerning the preparation, filing, and manner of prosecution of consolidated income tax returns.  *See* TAA §§ A.1 (UW Bancorp has option to make refunds to nonregulated first-tier Affiliates in its discretion; UW Bancorp may make a refund over the amount received or claimed in its sole discretion); C.5 (UW Bancorp receives certain benefits); D.4 (settlement calculations are to be made by UW Bancorp); F.2 (hypothetical estimated income tax liability is determined by UW Bancorp); and G.1 (UW Bancorp has general powers over tax matters).  Finally, all of the provisions of the TAA are governed by Colorado law.  TAA § H.6.

**V.   General Legal Standards.**

**A.   Legal Standard for Summary Judgment.**

Motions for summary judgment are governed by Fed. R. Civ. P. 56, as incorporated herein by Fed. R. Bankr. P. 7056.   Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   The moving party bears the initial burden of identifying the basis for its motion and designating those portions of the record which it believes entitles it to judgment.   Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing a motion for summary judgment, the Court must "view the facts and evidence in the light most favorable to the nonmoving party."   *Morris v. City of Colo. Springs,* 666 F.3d 654, 660 (10th Cir. 2012).   One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims or defenses."   *Celotex*, 477 U.S. at 324.   Therefore, unsupported, conclusory allegations will not create an issue of fact, and the moving party must do more than provide its subjective interpretation of the evidence.   *Tran v. Sonic Indus. Serv., Inc.*, 490 Fed. Appx. 115, 118 (10th Cir. 2012).   "A party cannot rely entirely on pleadings, but must present significant probative evidence to support its position."   *Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1247 (10th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

"If the nonmoving party fails to make a sufficient showing on an essential element with respect to which [it] has the burden of proof, judgment as a matter of law is appropriate."   *Id.* However, "when the evidence could lead a rational fact-finder to resolve the dispute in favor of either party, summary judgment is improper."   *C.L. Frates & Co. v. Westchester Fire Ins. Co.*, 728 F.3d 1187 (10th Cir. 2013).

In this case, the common set of undisputed material facts already identified by the Court serves as the basis for summary adjudication.   Neither the Trustee nor the FDIC requested an evidentiary hearing to challenge facts or provide additional extrinsic evidence.   Further, the Court determines that no evidentiary hearing is necessary.   Instead, the Court may apply the common set of undisputed facts within the applicable legal framework.

**B.   Section 541 and State Law.**

The Bankruptcy Code provides the basic structure for determining whether the Trustee is entitled to the Tax Refund as property of the UW Bancorp bankruptcy estate.   Section 541 is titled, "Property of the Estate," and states that the commencement of a bankruptcy case "creates an estate."   The estate includes: "*all legal or equitable interests of the debtor* in property as of the commencement of the case" "wherever located and by whomever held."   11 U.S.C. § 541(a) (emphasis added).   The text of the statute is exceedingly broad and encompassing.   *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198 (1983); *Parks v. Dittmar (In re Dittmar),* 618 F.3d 1199, 1207 (10th Cir. 2010) ("the scope of § 541 is broad and should be generously construed, and [] an interest may be property of the estate even if it is 'novel or contingent.'").[23]   However, if the bankruptcy debtor

---

[23]       Section 541(b) also contains a list of certain discrete and limited types of property that are not "property of the estate."

10

holds "only legal title and not an equitable interest," then the property "becomes property of the estate… only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."  11 U.S.C. § 541(d).

In the main, Section 541(a) dictates that all of the debtor's "legal or equitable interests" as of the bankruptcy petition date (whatever such interests were) become property of the debtor's bankruptcy estate to be administered under the Bankruptcy Code.  And, the bankruptcy estate receives only those property rights that the debtor had pre-petition — nothing more and nothing less.  That is because "[a] bankruptcy estate cannot succeed to a greater interest in property than the debtor held prior to bankruptcy."  *Redmond v. Rainstorm, Inc. (In re Lone Star Pub Operations, LLC)*, 465 B.R. 212, 216 (Bankr. D. Kan. 2010)  So, federal law (*i.e.,* Section 541(a)) determines the extent to which existing property interests may become property of the estate upon bankruptcy.

A long line of bankruptcy cases (even pre-dating the modern Bankruptcy Code) dictate that if a debtor owns or is entitled to a federal loss carryback tax refund, such refund generally becomes property of the debtor's bankruptcy estate.  *Segal v. Rochelle*, 382 U.S. 375, 380 (1966); *Kokoszka v. Belford*, 417 U.S. 642, 648 (1974); *Barowsky v. Serelson (In re Barowsky)*, 946 F.2d 1516, 1517-19 (10th Cir. 1991).  *Segal*, a Bankruptcy Act decision, is particularly instructive.  In that case, individual debtors "had both prior net income and a net loss when their petitions were filed" thus entitling them to federal income tax refunds.  The question was whether "the potential claims for loss-carryback refunds constituted 'property' [under Section 70a(5) of the Bankruptcy Act]."  *Id*. at 379.  The United States Supreme Court held:

> The main thrust of § 70a(5) [of the Bankruptcy Act] is to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition.  To this end the term "property" has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.
>
> . . . .
>
> Turning to the loss-carryback refund claim in this case, we believe it is sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as "property" [under the Bankruptcy Act].

*Id*. at 379-80.  When Congress later enacted Section 541(a) of the Bankruptcy Code, it expressly endorsed the *Segal* analysis and result.  S. Rep. No. 989, 95th Cong., 2nd Sess. 82, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5868; H. Rep. No. 595, 95th Cong., 1st. Sess. 367, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323 ("The result in *Segal*… is followed, and the right to a [tax] refund is property of the estate.")

But this case presents a somewhat more complicated issue.  Unlike *Segal*, in this case the Tax Refund is based upon consolidated corporate federal income tax returns and a net operating

loss carryback against prior income generated by a subsidiary of the bankrupt debtor.  The FDIC asserts that the Bank, not UW Bancorp, is the real owner of the Tax Refund such that the Tax Refund never became property of the UW Bancorp bankruptcy estate at all.  Alternatively, the FDIC suggests that if UW Bancorp had an interest in the Tax Refund, it was only a legal interest (not an equitable interest) so the UW Bancorp bankruptcy estate cannot recover the Tax Refund.

The dispute certainly involves federal law under Section 541(a), but also implicates state property law as well.  According to the United States Supreme Court:

> Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.  Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

*Butner v. U.S.*, 440 U.S. 54-55 (1979); *see also Dittmar*, 618 F.3d at 1204 ("For most bankruptcy proceedings, property interests are created and defined by state law."); *Parks v. FIA Card Serv., N.A. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir. 2008) (same).

## C.    Burden of Proof.

In cases where the bankruptcy debtor's ownership of property is challenged, the debtor has the initial burden to prove that it has legal title to the property.  *Lone Star Pub*, 465 B.R. at 216.  Thereafter, the burden shifts to the party challenging the bankruptcy estate.  The challenger must show that it holds beneficial interest in the property and that the bankruptcy debtor holds solely legal (not equitable) title.  *Id*.; *see also Amdura Nat'l Distribution Co. v. Amdura Corp., Inc. (In re Amdura Corp.)*, 75 F.3d 1447, 1451 (10th Cir. 1996).  The FDIC expressly concedes the respective burdens.  FDIC Memorandum at 3-4.

## VI.    Legal Conclusions.

## A.    UW Bancorp Has A Legal Interest in the Tax Refund.

Prior to bankruptcy, UW Bancorp was a bank holding company[24] that wholly-owned the Bank and the other 12 Affiliates.  This type of corporate organization for financial institutions is not at all unique and creates certain advantages in raising capital and also allowing flexibility for the corporate group to engage in a broader range of business activities than just traditional banking.  As a result, "[l]arge banking organizations in the United States are generally organized according to a bank holding company structure" under the Bank Holding Act, 12 U.S.C. § 1841.  Dafna Avraham et al., *A Structural View of U.S. Bank Holding Companies,* FEDERAL RESERVE BANK OF NEW YORK ECONOMIC POLICY REVIEW 65 (July 2012).

---

[24]    *See* 12 U.S.C. § 1841(a)(1) (defining "bank holding company" as "any company which has control over any bank or over any company that is or becomes a bank holding company").

The bank holding company structure allowed UW Bancorp and its Affiliates to file consolidated federal income tax returns and enjoy the beneficial tax treatment[25] afforded to affiliated companies that file tax returns on a consolidated basis.  26 U.S.C. § 1501 ("An affiliated group of corporations shall… have the privilege of making a consolidated return with respect to income tax . . . .").  The Trustee and the FDIC agree that UW Bancorp and its Affiliates, including the Bank, were members of an "affiliated group" for tax purposes.  26 U.S.C. § 1504(a) (defining "affiliated group"); *see also* 26 C.F.R. § 1.1502-1(a) (defining "group").  The "common parent corporation and each subsidiary which was a member of the group" generally are severally liable for the tax due for the consolidated return.  26 C.F.R. § 1.1502-6; see also Dale L. Ponikvar and Russell J. Kestenbaum, *Aspects of the Consolidated Group in Bankruptcy: Tax Sharing and Tax Sharing Agreements,* 58 TAX LAWYER 803, 824 (Summer 2005)  ("the Treasury Regulations take the easy route, making each member of the consolidated tax group liable for the entire tax liability of the group.").

IRS regulations govern the procedural mechanics for filing consolidated federal income tax returns.  Consolidated income tax returns may only be filed if each member of the affiliated group consents.  26 C.F.R. § 1.1502-75(a).  Consent may be manifested by joining in the making of a consolidated income tax return.  26 C.F.R. § 1.1502-75(b).  In order to streamline the process, the IRS requires that there be a "sole agent" for the consolidated group.  26 C.F.R. § 1.1502-77(a)(1).  That "one entity (the agent) is the sole agent that is authorized to act in its own name regarding all matters relating to the federal income tax liability for the consolidated return year for each member of the group."  *Id*.  In general, the agent must be the "common parent" for the affiliated group.  26 C.F.R. § 1.1502-77(c)(1).  Although the IRS regulations require the use of an "agent" for filing consolidated federal income tax returns, the agency is "purely procedural in nature." *Superintendent of Ins. of N.Y. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*, 269 B.R. 481, 489 (Bankr. E.D.N.Y. 2001), *aff'd* 377 F.3d 209 (2nd Cir. 2004).

The common parent effectively is the exclusive point of contact for interaction with the IRS.  26 C.F.R. § 1.1502-77(a) and (d).  For example, the common parent files the consolidated income tax return, makes all elections, files all extensions and "all correspondence concerning income tax liability . . . is carried on directly with the agent."  *Id.*  In fact, the members of the affiliated group generally are prohibited from representing themselves separately from the common parent for the consolidated tax return.  26 C.F.R. § 1.1502-77(e).

IRS regulations expressly address the refund process for consolidated federal income tax returns:

> The agent files claims for refund, and *any refund is made directly to and in the name of the agent* and discharges any liability of the Government to any member with respect to such refund.

26 C.F.R. § 1.1502-77(d)(5) (emphasis added); *see also Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 265 (9th Cir. 1973)("the refund is made

---

[25]     Consolidated tax returns allow a consolidated group "to utilize losses by one group member to reduce the consolidated group's overall tax liability."  *Downey Fin.*, 499 B.R. at 447.

payable to the parent and the acceptance of the refund by the parent discharges any liability of the government to the subsidiary").

Applying the foregoing statutes and regulations to this case, UW Bancorp was the holding company and corporate parent of the Bank. UW Bancorp and the Affiliated Group, including the Bank, filed consolidated federal income tax returns in 2008 and 2010. UW Bancorp and the Affiliates all consented to the filing of consolidated income tax returns. UW Bancorp was the "sole agent" (within the meaning of the IRS regulations) for the Affiliated Group. Based upon the applicable IRS regulations, UW Bancorp was "authorized to act in its own name regarding all matters relating to the federal income tax liability for the consolidated return year for each member of the [the Affiliated Group]." With respect to any refund, the IRS was required to make such refund "directly to and in the name of" UW Bancorp.

The TAA is entirely consistent with the Internal Revenue Code and IRS regulations regarding the procedure for consolidated federal income tax returns. Among other things, the TAA establishes "a method for . . . reimbursing UWBI [UW Bancorp] for the payment of [consolidated] tax liability. . . ." TAA at Second Preamble. In other words, the TAA confirms that UW Bancorp has the obligation to pay federal income taxes due for the entire Affiliated Group to the IRS. And, if a federal income tax loss carryback refund claim is warranted, such a claim for refund is to be filed by UW Bancorp. TAA § A.1 and G. Any refunds are payable to UW Bancorp (but refunds will lead to a "re-determin[ation]" of liability among the members of the Affiliated Group). TAA § A.1, G, and H.

Thus, the TAA, the Internal Revenue Code, and the IRS regulations all dictate that UW Bancorp, as the bank holding company for the Affiliated Group has *at least bare legal title* to the Tax Refund. After all, 26 C.F.R. § 1.1502-77(d)(5) requires that the Tax Refund be made "directly to and in the name of" UW Bancorp. *See First Cent. Fin.*, 269 B.R. at 487 (bankruptcy trustee for corporate parent "has a legal interest in the Tax Refund" for loss carrybacks of subsidiary based upon consolidated federal income tax returns).

**B.**     **The FDIC Fails to Establish That It Has Equitable Ownership of the Tax Refund.**

Since the Trustee has shown that he has legal title to the Tax Refund, the burden shifts to the FDIC to establish that it holds the beneficial interest in the Tax Refund (and the Trustee does not). *Lone Star Pub*, 465 B.R. at 216; *Amdura*, 75 F.3d at 1451. But, neither the Internal Revenue Code nor the IRS regulations establish which entity, UW Bancorp or the Bank, has equitable or beneficial ownership of the Tax Refund. *Bob Richards,* 473 F.2d at 264 (quoting *Western Pac. R.R. Corp. v. Western Pac. R. Co.*, 197 F.2d 994, 1004 (9th Cir. 1951) ("there is nothing in the [Internal Revenue] Code or Regulations that compels the conclusion that a tax saving must or should inure to the benefit of the parent company or of the company which has sustained the loss that makes the tax savings possible"); *First Cent. Fin.*, 269 B.R. at 489 ("the I.R.C. does not address the issue of which member of the consolidated group is ultimately entitled to receive a consolidated tax refund.").

In the absence of a directly applicable statute or regulation, parties are free to address tax allocation issues contractually. Such tax sharing agreements are common among corporate families. "Normally, where there is an explicit agreement, or where the agreement can fairly be

14

implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability." *Bob Richards*, 473 F.2d at 264. That is exactly what happened in this case — UW Bancorp, the Bank, and the other 12 members of the Affiliated Group entered into the TAA (Tax Allocation Agreement). Thus, the unambiguous terms[26] of the TAA as construed under Colorado law govern the rights and obligations of UW Bancorp and the Bank and also dictate the ultimate entitlement to the Tax Refund on a beneficial basis.[27] *First Cent. Fin.*, 269 B.R. at 489 ("the parties' rights and obligations are governed by the Tax Allocation Agreement").

1. **The TAA Embodies a Debtor-Creditor Relationship between UW Bancorp and the Bank for the Tax Refund.**

Although there is no binding precedent in this jurisdiction regarding competing claims in a bankruptcy case to ownership of a net operating loss carryback federal income refund based upon consolidated federal income tax returns and an existing tax allocation agreement, the issue has caused quite a stir nationally. Under the dominant approach, courts examine three key factors when considering whether a particular tax sharing agreement "establishes a debtor-creditor relationship or a different relationship (such as trust, mere agency, or bailment)." *Downey Fin.*, 499 B.R. 439. The factors are:

- Does the TAA create fungible payment obligations?

- Does the TAA contain escrow obligations, segregation obligations, or use restrictions for tax refunds?

- Does the TAA delegate the tax filer under the agreement with sole discretion regarding tax matters?

*See Siegel v FDIC (In re Indymac Bancorp, Inc.)*, 2012 WL 1037481, at *13-17 (Bankr. C.D. Cal. Mar. 29, 2012), *adopting report and recommendation,* 2012 WL 1951474, at *3 (C.D. Cal. May 30, 2012), *aff'd*, 554 Fed. Appx. 668, 670 (9th Cir. 2014) (unpublished); *Downey Fin.*, 499 B.R. at 455. Although the issues are not entirely clear-cut, the Court determines that each of the factors favor a determination that the TAA creates a debtor-creditor relationship between UW Bancorp and the Bank.

a. **The TAA Creates Fungible Payment Obligations.**

"Courts across the country have repeatedly held that terms such as 'reimbursement' and 'payment' in a tax sharing agreement evidence a debtor-creditor relationship." *Imperial Capital Bancorp v. FDIC (In re Imperial Capital Bancorp, Inc.)*, 492 B.R. 25, 30 (S.D. Cal. 2013); *see also Downey Fin.*, 499 B.R. at 455; *IndyMac*, 2012 WL 1037481, at *13. The reason "is that such terms create 'ordinary contractual obligations' or 'an account, a debtor-creditor relationship, which

---

[26]   Both the Trustee and the FDIC contend that the TAA is unambiguous. (Docket No. 47 at 10; Docket No. 52 at 9.) Both parties also confirmed their positions that the TAA is unambiguous at oral argument.

[27]   In the absence of an agreement, a federal income tax loss carryback refund based upon a consolidated federal income tax return may most appropriately belong to the subsidiary that generated the income and net operating losses. That is the lesson of the *Bob Richards*. 473 F.2d at 264. But, as set forth below, the *Bob Richards* default rule does not apply in this case.

is the quintessential business of bankruptcy.'" *IndyMac*, 2012 WL 1037481, at *13; *see also Team Fin., Inc. v. FDIC (In re Team Fin., Inc.)*, 2010 WL 1730681, at *10-11 (Bankr. D. Kan. Apr. 27, 2010) (focusing on terms "pay," "payment," and "compensate").

In this case, the TAA is peppered throughout with terminology evidencing a debtor-creditor relationship including: "allocating," "reimbursing," "compensating," "pay," "refund," "liability," "reimburse," "liable," "payments," "refunded," and "liability." *See* TAA §§ Preamble ("allocating the consolidated tax liability"; "reimbursing UWBI for the payment of such tax liability"; "compensating each member of the Group for the use of its losses"); A.1 ("each Affiliate shall pay UWBI"; "Affiliate is entitled to a refund"; "any refund shall generally not exceed the amount claimed"; UW Bancorp may "make a refund over the amount received or claimed . . . if in its sole discretion it believes such payment is in its best interest"; "such item shall not enter into the calculation of liability"); C.1 (UW Bancorp "will not reimburse the Affiliate for the related tax benefit"); C.3.a ("an Affiliate shall be reimbursed"); C.3.b ("an Affiliate . . . shall be reimbursed"); C.5 ("liable for payments to UWBI"); E.1 ("preliminary tax settlement payments are due"; "overpayments of estimates taxes made by Affiliates are not refunded until final tax settlement is done"); E.2 ("Final tax settlement payments or refunds are due"); F.1. ("Estimated payments of Federal and State taxes shall be made by Affiliates"); F.2 ("Affiliates shall pay to UWBI"); F.3 ("Payments to an Affiliate for net operating losses"); H.1 ("payments between the appropriate parties"); H.4 ("liability of the Affiliates").

But, of course, words can only be understood in context. Contract interpretation requires that courts "examin[e] the entire instrument, and not . . . view [] clauses or phrases in isolation." *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (citing *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo.2002)). As in *IndyMac* and *Downey Financial*, the TAA in this case "creates a system of intercompany 'payments' and 'reimbursements' that may differ from the amount of any tax refund actually received by UW Bancorp." *Downey Fin.*, 499 B.R. at 456.

First, there is the payment side of the ledger. The TAA required the Bank and all other Affiliates to pay UW Bancorp. On a quarterly basis, each Affiliate was obligated to "pay" to UW Bancorp "an amount equal to the amount of any estimated federal income taxes which the Affiliate would have been required to pay" if filing separately. TAA § F.1 and F.2. UW Bancorp determined the amounts required to be paid for such "hypothetical estimated income tax liability." *Id*. Similarly, on an annual basis, the Affiliates were obligated to make "payments" to UW Bancorp for "preliminary tax settlement payments" TAA § E.1. The general rule was that Affiliates needed to pay UW Bancorp the amounts that would have been due if each Affiliate had filed separate tax returns. TAA § A.1

Second, there is the obligation to make reimbursements or refunds. If an Affiliate overpaid estimated annual preliminary tax settlement payments to UW Bancorp, the overpayment would be addressed through a "refund" when "final tax settlement is done." TAA § E.1. And, "final tax settlement payments or refunds" were due on or before November 15 of each year. TAA § E.2. With respect to "payments to an Affiliate for net operating losses or similar items," such payments were to be made on an "annual basis." TAA § E.3. That is, the Affiliate with a net operating loss was "entitled to a refund [from UW Bancorp] equal to the amount that it would have been entitled to receive had it not joined in the filing of the joint return." TAA § A.1. The TAA also provided a

16

mechanism for earlier payment of refunds or reimbursements to Affiliates in certain circumstances. The Affiliate could "file[]" an "'expedited refund' claim" with UW Bancorp.  TAA § E.1.  All of the foregoing refund and reimbursement obligations did not depend on UW Bancorp actually receiving a tax refund from the IRS.  In other words, irrespective of whether or not UW Bancorp received a refund from the IRS, it was still obligated to make such payments to its Affiliates.

The TAA also addressed the issue of "any adjustment to the tax returns of the Group."  TAA § H.1.  If there was any adjustment "by reason of an amended return, claim for refund, or by an audit by the taxing authority," then the TAA mandated that "***the liability** of the parties to this Agreement **shall be re-determined to give effect to any such adjustment** as if it had been made as part of the original computation of tax liability*."  TAA § H.1 (emphasis added).  Put another way, if UW Bancorp successfully prosecuted a claim for a tax refund with the IRS for a prior consolidated federal income tax return, then the TAA required a "re-determination" of intercompany liability based upon such adjustment.  Then, based upon the "re-determination" of liability, "payments between the appropriate parties [were to] be made within 10 business days after any such payments are made or refunds are received . . . ."  TAA § H.1.  Thus, if and when UW Bancorp received a tax refund from the IRS, it would have ten days after receipt of the refund from the IRS in which to pay the Affiliates according to the "re-determination" of liability.

Nothing in the TAA suggests that the Bank had a direct interest in any IRS tax refunds.  Further, nothing in the TAA requires or even remotely suggests that any tax refund received by UW Bancorp from the IRS had to be handed over to an Affiliate, such as the Bank.  Additionally, nothing in the TAA expressly or implicitly suggests that the Bank owns any tax refunds made by the IRS to UW Bancorp.

The foregoing provisions regarding IRS refund claims by UW Bancorp are very similar to the tax sharing agreement in *Downey Financial*.  The *Downey Financial* tax sharing agreement provided that:

> [I]f adjustments of the consolidated tax liability occur as a result of the filing of an amended return, claim for a refund or an audit, 'the liability of the Affiliate Group members shall be **recomputed by Financial** to give effect to such adjustments.  In the case of a refund, Financial shall make **payment** to each Affiliated Group member for its share of the refund . . . within seven (7) business days after the refund is received by Financial.

*Downey Fin.*, 499 B.R. at 456 (emphasis in original).  The *Downey Financial* court correctly characterized these provisions as creating a system of intercompany payments and refunds "indicative of a debtor-creditor relationship."  *Id.* at 457.  Similar provisions and terminology also led to the *IndyMac* court to the same conclusion.  *IndyMac*, 2012 WL 1037481, at *14 ("This right to receive fungible 'payments' using a formula calculated as if the Bank were a separate tax filer is meaningfully different from the right to receive and specific *refunds* upon receipt . . . .  The overall system of intercompany 'payments' or 'reimbursements' established by the TSA strongly evidence the parties' creation of a debtor-creditor relationship."); *see also Team Fin.*, 2010 WL 1730681, at *11 (reaching same conclusion of debtor-creditor relationship based on terms of tax sharing agreement).

17

The Court concludes that the TAA created fungible payment obligations through an intercompany account of payments and reimbursements.  The repeated use of words like "payment" and "reimbursement" throughout the TAA indicates that the parties were creating a debtor-creditor relationship.  And, more than just the words themselves, the entire TAA, in context, supports the Court's conclusion.

### b.   The TAA Contains No Escrow, Segregation, or Use Restrictions for Tax Refunds.

As explained in *IndyMac*, "courts have repeatedly found that the lack of provisions requiring the parent to segregate or escrow any tax refunds and the lack of restrictions on the parent's use of funds while in the parent's possession further evidences a debtor-creditor relationship."  2012 WL 1037481, at *15.  Consideration of this factor is fairly simple in this case.  One could search the TAA in vain for days trying to locate any express, or even implied, requirement for UW Bancorp to escrow or segregate any funds that it might receive as a tax refund from the IRS.  The reason is that the TAA contains absolutely no such provisions.  And, neither are there any restrictions in the TAA on UW Bancorp's use of any tax refunds.  The lack of any such provisions strongly supports the Trustee's position.

### c.   The TAA Delegates Decision-Making on Tax Matters to UW Bancorp.

Consistent with IRS regulations for consolidated federal income tax returns, the TAA vests UW Bancorp with the exclusive power to file consolidated federal income tax returns.  TAA § G.1.  Furthermore, UW Bancorp has the power to make "any election, application, or tak[e] any action" in connection with the consolidated federal income tax returns on behalf of the Affiliates.  TAA § G.1.  UW Bancorp also is the entity charged with making payment to the IRS.  With respect to quarterly tax settlement payments, the TAA provides that "hypothetical estimated income tax liability shall be determined by UWBI [UW Bancorp] by any reasonable manner . . . ."  TAA § F.2.  The Affiliates, including the Bank, have no express decision-making authority under the TAA.  Instead, the role of the Affiliates is to make payments to UW Bancorp and receive potential reimbursements.  The foregoing further counsels in favor of the Trustee.

### d.   The TAA Creates a Debtor-Creditor Relationship.

In sum, the Court finds that under the terms of the TAA, UW Bancorp is the beneficial owner of the Tax Refunds.  UW Bancorp was obligated to pay all federal income taxes for the Affiliated Group.  UW Bancorp collected tax payments from its Affiliates.  To the extent that any Affiliate overpaid, UW Bancorp was obligated to make a reimbursement to such Affiliate.  In the event of any tax refund from the IRS, like the Tax Refund in this case, UW Bancorp was obligated to re-determine the parties' liability to account for such adjustment and then make appropriate payments.  The undisputed facts dictate that the Tax Refund belongs to the Trustee (as Trustee of the UW Bancorp bankruptcy estate).  The Court's legal conclusion is consistent with compelling precedent from the Second, Third and Ninth Circuit Courts of Appeals.[28]  *First Cent. Fin.*, 377

---

[28]   Decisions from the Sixth and Eleventh Circuit Courts of Appeal have reached contrary results.  The Court distinguishes those decisions below.

F.3d 209; *Downey Fin.*, 593 Fed. Appx. 123; *IndyMac*, 554 Fed. Appx. 668.  Numerous District Courts and Bankruptcy Courts have reached similar conclusions.  *Sharp v. FDIC (In re Vineyard Nat'l Bancorp)*, 508 B.R. 437 (Bankr. C.D. Cal. 2014); *Downey Fin*, 499 B.R. at 439; *Imperial Capital*, 492 B.R. 25; *IndyMac*, 2012 WL 1951474; *First Cent. Fin.*, 269 B.R. 481; *Team Fin.*, 2010 WL 1730681; *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 159 B.R. 9 (Bankr. D. Kan. 1993).

## 2.     **The FDIC's Conduit Argument Is Unavailing**.

The FDIC argues that UW Bancorp is only a "conduit" for the Tax Refund and thus has no beneficial interest in the property under Colorado law.  FDIC Memorandum at 9-11.  The linchpin of the argument is a single word contained in the TAA:  "intermediary."  TAA § A.2 states:

> In essence, this Agreement requires that each first-tier subsidiary [the Bank] be treated as a separate taxpayer with UWBI [UW Bancorp] merely being an *intermediary* between an Affiliate and the Internal Revenue Service ("IRS").

(Emphasis added).  The FDIC equates the alleged mere intermediary status of UW Bancorp to a "conduit that lacks beneficial title."  FDIC Memorandum at 10-11.  The FDIC's position has some initial surface allure — but little real substance.  The FDIC MSJ relies principally on two supporting decisions:  *In re West Central Housing Development Organization*, 338 B.R. 482 (Bankr. D. Colo. 2005) and *Wadsworth v. High Speed Aggregate, Inc. (In re Trick Technologies, Inc.)*, 2013 WL 3865592 (Bankr. D. Colo. July 22, 2013).  Neither case is particularly instructive for the circumstances of this dispute.

The FDIC cites *West Central Housing* for the proposition that:

> Colorado law further provides that the funds in debtor's possession need not be subject to express trust in order to be excluded from property of the bankruptcy estate.  Rather, the funds are excluded from the bankruptcy estate's property in any situation in which a debtor was intended to serve as a mere "conduit" of the funds in its possession and was not intended to have a beneficial interest.

FDIC Memorandum at 10.  The FDIC's characterization of *West Central Housing*, while technically accurate, ignores the context of that decision.  In *West Central Housing*, the fight was over ownership of about $1.9 million of "Revolving Loan Assets."  338 B.R. at 485.  The debtor, a non-profit company providing loans for low income housing projects and residential rehabilitation, held the Revolving Loan Assets.  But, the State of Colorado claimed the Revolving Loan Assets because they were "derived from block grant monies given to the State by the federal government for the purpose of supporting housing rehabilitation and home ownership."  *Id*.  The State argued that the Revolving Loan Assets were held in trust by the debtor and never became property of the debtor's bankruptcy estate.  The Bankruptcy Court agreed and ruled that "an express trust has been created by contract provisions and federal regulations with respect to the bulk of the Revolving Loan Assets.  Those funds are very clearly excluded from the bankruptcy estate."  *Id*. at 490.  That is the central holding.  Obviously, the present circumstances are entirely different.  The TAA did

not create a trust, express or otherwise.  The FDIC also cites *West Central Housing* for the proposition that:

> An "intermediary" is someone "who lacks beneficial title and is
> merely an agent for disbursal of funds belonging to another."  *Id*.
> (quoting *In re Joliet-Will County Cmty. Action Agency,* 847 F.2d 430
> (7th Cir. 1988)).

FDIC Memorandum at 10.  It is true that Judge Tallman's *West Central Housing* decision quoted the following passage from Judge Posner's *Joliet-Will* decision:

> The answer depends on the terms under which the grants were made.
> Did they constitute Joliet-Will a trustee, custodian, or other
> intermediary, who lacks beneficial title and is merely an agent for
> the disbursal of fund belonging to another?  If so, the funds . . . were
> not assets of the bankruptcy estate.

*West Cent. Hous.*, 338 B.R. at 493 (quoting *Joliet-Will*, 847 F.2d at 432).  So, the sentence quoted by the FDIC in support of its argument is only a question, not a holding.  Read fairly, neither *West Central Housing* nor *Joliet-Will* stand for the proposition that using the word "intermediary" magically negates any claim to beneficial ownership by the Trustee.

Similarly, the FDIC reads too much into *Trick Technologies*.  That decision did not involve a Section 541 property of the estate issue.  Instead, the principal issue in *Trick Technologies* was whether a law firm that had received funds in its client trust fund account could be considered an "initial transferee" under Section 550.  The Bankruptcy Court seemed to use the phrase "intermediary party" as a synonym for "initial transferee."  *Trick Techs.*, 2013 WL 3865592, at *2. This is the real holding of *Trick Technologies.*:

> The term "initial transferee" is not defined in the Bankruptcy Code,
> but the Tenth Circuit has adopted the "dominion and control test . . . .
> Under the dominion and control test.  A party is not considered an
> initial transferee of a transfer received directly from a debtor unless
> that party gains actual dominion or control over the funds.  When an
> intermediary party receives but does not gain actual control over the
> funds, that party is considered a mere conduit or agent for one of the
> real parties to the transaction.  Here, the Court concludes that neither
> the Law Firm [which received funds into its client trust fund account]
> nor the Clerk of the State Court had sufficient dominion or control
> over the transferred funds to be considered initial transferees.

*Id*. (citations omitted).  So, put in context, *Trick Technologies* does not add much to this case and instead stands only for the sound proposition that a law firm receiving money in its client trust account is not an initial transferee under Section 550.

But even though the FDIC's legal support for the "conduit" argument seems quite thin, what to make of the use of the word "intermediary" in Section A.2 of the TAA?  The word is

certainly there in black and white.  The Court simply construes the word in a more benign and limited fashion than the FDIC.  That UW Bancorp was an "intermediary" between the Bank and the IRS, appears to the Court to mean nothing more than that UW Bancorp is the corporate parent of the Affiliated Group under the IRS regulations governing consolidated federal income tax returns and fulfills the regulatory obligations of the common parent.  For example, UW Bancorp was the exclusive point of contact for interaction between the Affiliated Group and the IRS.  26 C.F.R. § 1.1502-77(a) and (d).  And, UW Bancorp was required to file the consolidated income tax return, make all elections, file all extensions, and engage in all communications since the Bank was itself generally prohibited from representing itself separately before the IRS for the consolidated tax return.  26 C.F.R. § 1.1502-77(a), (d) and (e).  The Court does not believe that use of the word "intermediary" somehow dispositively establishes that the Tax Refund belongs to the FDIC instead of the Trustee.

### 3.  <u>**The FDIC's Agency Argument Fails.**</u>

The FDIC contends that the corporate parent, UW Bancorp, was an agent acting on behalf of its principal, the Bank, for purposes of ownership of the Tax Refund.  FDIC Memorandum at 11.  The argument continues that since UW Bancorp was only an agent, in cannot have a beneficial interest in the Tax Refund.  The argument has some visceral pull.

The FDIC is correct that the TAA designates UW Bancorp as an agent for the Bank and the other members of the Affiliated Group.  The TAA states:

> Each Affiliate hereby appoints UWBI [UW Bancorp] as its agent…
> for the purpose of filing such consolidated Federal Income tax
> returns for the UWBI group as UWBI may elect to file and making
> any election, application or taking any action in connection therewith
> on behalf of the Affiliates.

TAA § G.1.  Although the text of the TAA nowhere states that UW Bancorp is an agent for purposes of ownership of the Tax Refund, the FDIC contends that "it is logical that the Debtor must also be an agent when it recovers the tax refunds."  FDIC Memorandum at 11.  For further support, the FDIC also relies on the IRS regulations governing the procedure for consolidated federal income tax returns.  Again, the FDIC is correct inasmuch as the IRS requires that there be a "sole agent" for the consolidated group.  26 C.F.R. § 1.1502-77(a).  The IRS requires that "one entity (the agent) is the sole agent that is authorized to act in its own name regarding all matters relating to the federal income tax liability for the consolidated return year for each member of the group."  *Id.*  And, in general, the agent must be the "common parent" for the affiliated group.  26 C.F.R. § 1.1502-77(c).  There can be no doubt whatsoever that UW Bancorp was indeed an "agent" under the TAA and IRS regulations.

But what was the import of such agency?  Was it limited or was it unrestricted?  And did it somehow equate with common law agency or a trust under Colorado law?  These are all difficult questions.  Ultimately, the Court believes that the FDIC argument misapprehends the type of agency contained in the TAA and the IRS regulations.  By its terms, the agency referenced in the TAA (and included in the IRS regulations) is limited and procedural only.  TAA § G.1 does not appoint UW Bancorp as an agent for all purposes.  Instead, the agency is limited to "filing such consolidated Federal Income tax returns for the UWBI group as UWBI may elect to file and

making any election, application or taking any action in connection therewith . . . ."  The agency language says nothing about UW Bancorp being an agent for holding any tax refunds for the Bank's benefit, nor that the Bank owns the Tax Return.

The Court also observes that the FDIC's agency argument appears to be too expansive. While the TAA did identify UW Bancorp as an agent for the Affiliated Group for purposes of filing consolidated federal income tax returns, it did so using language very similar to the IRS regulations.  26 C.F.R. § 1.1502-77(a) and 77(c).  In other words, whether the agency designation was included in the TAA or not, UW Bancorp still would have been an agent for filing consolidated federal income tax returns under the IRS regulations.  Effectively, all parent bank holding companies filing consolidated federal income tax returns are agents in the same sense that UW Bancorp is an agent.  Taking the FDIC's argument to its logical conclusion, this means that all parent bank holding companies filing consolidated federal income tax returns are precluded from recovering such tax refunds (or at least do not have any beneficial interest in such tax returns) even if a tax sharing agreement exists.  But this cannot be, especially in the face of a strong line of appellate and trial court decisions finding that parent bank holding companies may be entitled to tax refunds under Section 541 and the terms of tax sharing agreements.  The foregoing suggests that the FDIC's argument misapprehends the nature of the agency used in the IRS regulations and tax sharing agreements.  *See Imperial Capital*, 492 B.R. at 32 (rejecting argument that 26 C.F.R. § 1.1502-77(a) means that the bank holding company receives tax refunds only as agent"); *Team Fin.*, 2010 WL 1730681, at *6 (the "agent" under the IRS regulations is akin to a "spokesman" for the group).

In any event, the agency referenced in the TAA is not consistent with Colorado common law agency.  In Colorado, there can be no agency relationship where the alleged agent is not subject to the control of the alleged principal.  *Montano v. Land Title Guarantee Co.*, 778 P.2d 328, 331 (Colo. App. 1989); *Amdura*, 75 F.3d at 1451; *see also Downey Fin.*, 593 Fed. Appx. at 126 (under California law, the tax sharing agreement did not create a principal/agent relationship because the subsidiary bank did not exercise control over the parent bank holding company).  The FDIC is turning agency on its head because the Bank did not control UW Bancorp (or at least the FDIC produced no evidence that the Bank controlled UW Bancorp).  Subsidiaries generally do not control their parents.  So, the agency argument does not work.

But what the FDIC seems to be attempting is to suggest an argument sounding primarily in trust rather than agency (*i.e.*, that the Tax Refund must be held in trust by UW Bancorp for the benefit of the Bank).  The argument does not fare well.  In the FDIC MSJ, the FDIC did not allege any sort of trust.  Further, the FDIC provided no evidence of the existence of a trust relationship between UW Bancorp and the Bank.  Nevertheless, for the first time in a reply, the FDIC asserted that "[t]he Tax Allocation Agreement shows the intent that the tax refund be held in trust." (Docket No. 458 and 14.)  But then, later, the FDIC turned around and expressly disclaimed that it was trying to assert a constructive trust under Colorado law.  (Docket No. 52 at 5) ("the FDIC-Receiver is not asserting that the Court should impose a constructive trust over the Tax Refund").  All of this leaves the Court quite confused as to the FDIC's position regarding possible trust issues.  But, even if the FDIC were asserting a trust theory under Colorado law (which it seems to have discarded), the effort would fail.

Colorado recognizes three main types of trusts: express trusts; constructive trusts; and resulting trusts. "Colorado law provides the following elements are required to establish an express private trust: '(1) the settlor's capacity to create a trust; (2) his intention to create a trust; (3) a declaration of trust or a present disposition of the res; (4) an identifiable trust res; (5) a trustee; and (6) identifiable beneficiaries.'" *Connolly v. Baum (In re Baum)*, 22 F.3d 1014, 1017-1018 (10th Cir. 1994) (quoting *Sims v. Baker (In re Estate of Granberry)*, 498 P.2d 960, 963 (Colo. App. 1972). The FDIC has not established the existence of an express trust. There is no declaration of trust. And, the TAA neither mentions the word "trust" nor incorporates any express trust concepts. The FDIC appears to concede the lack of an express trust. (Docket No. 48 at 14) ("While the Tax Allocation Agreement does not contain the word 'trust,' under Colorado law the FDIC-Receiver does not have to show the creation of the express trust . . . .").

A constructive trust "arises in the presence of fraud, duress, abuse of confidence, or some other form of questionable or unconscionable conduct by which the trustee obtained the property. In all such situations, however, a constructive trust is appropriate only if there has been wrongful conduct by the party charged with the trust." *Wirt v. Prout*, 754 P.2d 429, 430 (Colo. App. 1988). In *Shepler v. Whalen*, 119 P.3d 1084, 1089 (Colo. 2005), the Colorado Supreme Court clarified the scope of constructive trusts and characterized them as "fraud-rectifying trusts" that are imposed in cases of fraudulent transfers, breach of contractual or fiduciary obligation, fraud, or other wrong doing. "The remedy of constructive trust is generally disfavored in bankruptcy." *First Cent. Fin.*, 269 B.R. at 499. In this case, there simply is no allegation and certainly no evidence of fraud or malfeasance by UW Bancorp or the Trustee. Further, the FDIC also disclaimed the existence of any constructive trust. So, no constructive trust can be imposed.

That leaves a resulting trust. "A resulting trust is a trust implied by law when the circumstances surrounding the transfer of property raise the inference that the parties intended to create a trust." *Mancuso v. United Bank of Pueblo*, 818 P.2d 732 738-39 (Colo. 1991). The circumstances justifying the imposition of a resulting trust are fairly limited. The Colorado Supreme Court has identified three situations in which a resulting trust may be appropriate:

> (1) where an express trust fails in whole or in part; (2) where an express trust is fully performed without exhausting the trust estate; (3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person.

*Shepler*, 119 P.3d at 1089 (quoting *Page v. Clark*, 592 P.2d 792, 797 (Colo. 1979)). In this case, there was no express trust and the *Shepler* circumstances are absent. Although the FDIC hinted at a possible resulting trust (in one citation in its opposition to the Trustee MSJ), the FDIC failed to establish any evidence of intent to create a trust between UW Bancorp and the Bank. Accordingly, imposing a resulting trust is not warranted.

### 4.   The *Bob Richards* Default Rule Does Not Apply Because the Affiliated Group Agreed to the TAA.

The Ninth Circuit Court of Appeals established an important default rule for distribution of loss carryback tax refunds based upon consolidated income tax returns in the absence of any

agreement amongst the members of a consolidated group.  *Bob Richards*, 473 F.2d at 265.  The appellate court stated:

> Normally, where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability.  But in the instant case the parties made no agreement concerning ultimate disposition of the tax refund.  Absent any differing agreement we feel that a tax refund resulting from offsetting losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member.

*Bob Richards*, 473 F.2d at 265.  The *Bob Richards* default rule makes good equitable sense and has been endorsed by the Tenth Circuit Court of Appeals and many other courts.  *Barnes v. Harris*, 783 F.3d 1185, 1196 (10th Cir. 2015) ("plaintiffs have not alleged the existence of any agreement to allocate the refund").

As one of its alternative arguments, the FDIC contends that the *Bob Richards* default rule should apply in this case because the TAA allegedly does not "determine the ownership issue."  FDIC Memorandum at 15.  The FDIC position stretches *Bob Richards* too far.  In *Bob Richards* there simply was "no agreement concerning ultimate disposition of the tax refund."  *Bob Richards*, 473 F.2d at 265.  But in this case, and unlike in *Bob Richards*, there is such an agreement.  UW Bancorp, the Bank and the other 12 members of the Affiliated Group entered into a detailed and express agreement (the TAA) that specifically addresses tax allocation issues.  The TAA governs both the payment of taxes and the disposition of possible tax refunds.  Since UW Bancorp paid federal income taxes to the IRS for the Affiliated Group on a consolidated basis, the members of the Affiliated Group were required to pay UW Bancorp their respective shares quarterly and annually in advance.  TAA §§ A.1, E.1, E.2, F.1, and F.2.  The TAA provided for later true-ups.  With respect to net operating loss carryforwards, generally, UW Bancorp was obligated to pay to the respective Affiliate annually.  TAA § F.3.  If refunds were received, UW Bancorp was required to "re-determine" the "liability of the parties" to "give effect to any such adjustment."  TAA § H.1.

So, the TAA is an agreement "concerning ultimate disposition of the tax refund" — the exact type of agreement that was absent in *Bob Richards*.  Since such an agreement is present, the *Bob Richards* default rule is facially inapplicable.  *Downey Fin.*, 499 B.R. at 455 (rejecting application of the *Bob Richards* default rule because of the existence of a tax sharing agreement); *First Cent. Fin.*, 269 B.R. at 489 (declining to apply the *Bob Richards* holding where the parties had a tax allocation agreement); *Indymac*, 2012 WL 1037481, at *26-27 (same).

The *Indymac* cases are particularly instructive since they addressed the import of *Bob Richards* within the jurisdictional boundaries of the Ninth Circuit Court of Appeals.  The *Indymac* Bankruptcy Court determined that the *Bob Richards* holding is only "a gap-filling rule limited to circumstances when no tax sharing agreement — express *or* implied — exists between the parties."  *Indymac*, 2012 WL 1037481, at *26.  Since there was a tax sharing agreement, the *Indymac* Bankruptcy Court easily found the *Bob Richards* default rule inapposite.  At the first level appeal, the *Indymac* District Court concurred and held:  "*Bob Richards* is inapplicable to the

present case because the parties signed the TSA [tax sharing agreement]." *Indymac*, 2012 WL 1951474, at \*3.  Finally, and most importantly, the Ninth Circuit Court of Appeals, which itself had issued the *Bob Richards* decision, confirmed its narrow application.  The *Indymac* Court of Appeals noted that there was a tax sharing agreement which required the bank to pay the bank holding company its share of taxes and also described "the process by which Bancorp will allocate tax refunds." *Indymac*, 554 Fed. Appx. at 670.  The Ninth Circuit Court of Appeals rejected the *Bob Richards* default rule as inapplicable because of the presence of the tax sharing agreement.  *Id*.  To decide the case, the *Indymac* Court of Appeals relied on the tax sharing agreement and affirmed that the federal income tax refund belonged to the bankruptcy estate of the parent bank holding company.  *Id*.

Given the existence of the TAA in this case, the *Bob Richards* default rule is facially inapplicable.  Instead, the Court is obligated to use the terms of the TAA to determine the beneficial interest issue within the Section 541 framework.

### 5.  Contrary Case Law Is Distinguishable and Not Binding.

The FDIC hangs its hat on a trilogy of recent appellate decisions ruling in its favor on similar tax refund issues in bankruptcy:  *BankUnited*, 727 F.3d 1100; *FDIC v. Zucker (In re NetBank, Inc.)*, 729 F.3d 1344 (11th Cir. 2013), *cert. denied*, 135 S.Ct. 476 (2014); and *FDIC v. AmFin Fin. Corp.*, 757 F.3d 530 (6th Cir. 2014), *cert. denied*, 135 S.Ct. 1402 (2015).  But, the Court concludes that each of these decisions is distinguishable and not persuasive in the circumstances of this case.

#### a.  *BankUnited*.

In *BankUnited*, "the sole issue . . . [was] whether the Bankruptcy Court erred in declaring the tax refunds [pursuant to consolidated federal income tax returns] an asset of the bankruptcy estate [of the parent bank holding company]."  *BankUnited*, 727 F.3d at 1104.  So, the question was very similar to this case, but the tax sharing agreement in *BankUnited* was quite different from the TAA in this case.  In *BankUnited*, the tax sharing agreement provided that the principal subsidiary bank (not the parent bank holding company) was required to pay the taxes for the entire consolidated group to the IRS.  *Id*. at 1103.  All of the affiliated companies in *BankUnited* (including the corporate parent) were obligated to pay their portion of taxes to the subsidiary bank.  And, the *BankUnited* subsidiary bank was required to pay any tax refunds to the members of the affiliated group.  The subsidiary bank argued that it was entitled to the tax refunds because it had a "contractual obligation to distribute them [the tax refunds] to the members of the Group."  *Id*.  Ultimately, the Eleventh Circuit Court of Appeals reversed the trial court and determined that the $48 million in tax refunds belonged to the subsidiary bank, not the bankrupt parent holding company.

In the Court's view, the *BankUnited* appellate result was driven almost entirely by the very unusual terms of the tax sharing agreement.  The subsidiary bank (not the parent bank holding company) was required to make all tax payments, collect all taxes from the consolidated group, and distribute any refunds to the other affiliates.  That is simply not the situation in this case.  And, *BankUnited* made no mention of the Bankruptcy Code at all.  Accordingly, the Court gives the *BankUnited* decision, which is not binding precedent in this jurisdiction, little weight.

b.  *NetBank*.

Right on the heels of *BankUnited*, the Eleventh Circuit Court of Appeals again addressed another similar dispute.  *NetBank*, 729 F.3d 1344.  In *NetBank*, the bankrupt parent bank holding company sued its subsidiary bank over a $5.7 million tax refund based upon the net operating loss carrybacks generated from the operations of the subsidiary bank.  *Id.* at 1346.  The bankrupt bank holding company won at the trial level.  On appeal, as in *BankUnited*, the Eleventh Circuit Court of Appeals did not delve into bankruptcy law.  Instead, the focus was solely on the tax sharing agreement between the bankrupt parent bank holding company and its affiliates.  Although many of the provisions of the *NetBank* tax sharing agreement were similar to the TAA in this case, there was one very critical difference.

The *NetBank* tax sharing agreement provided that "[t]his Agreement is intended to allocate the tax liability in accordance with the Interagency Statement on Income Tax Allocation in a Holding Company Structure [the Policy Statement] . . . ."  63 Fed. Reg. 64,757 (Nov. 23, 1988).  According to the appellate court, "[t]he Policy Statement contains language specifically stating that the parent receives refunds from a taxing authority as 'agent' on behalf of group members."  *NetBank*, 729 F.3d at 1349.  The Policy Statement also states:  "an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."  63 Fed. Reg. at 64,759.  Ultimately, the *NetBank* appellate court reversed and determined that the subsidiary bank, not the parent bank holding company, was entitled to the tax refund.

In the Court's assessment, the incorporation of the Policy Statement into the *NetBank* tax sharing agreement was dispositive (or at least nearly so) in that case.  However, the TAA in this case is meaningfully different.  The TAA does not reference, and certainly does not incorporate, the Policy Statement.  Thus, the Court finds that the *NetBank* decision, which is not binding in this jurisdiction, is so factually distinguishable that it offers little guidance in this case.

c.  *AmFin*.

In *AmFin,* the question was "who owns a $170 million tax refund: a parent corporation that filed a consolidated tax return on behalf of its subsidiaries and to whom the IRS issued the refund, or the subsidiary whose net operating loss generated the refund?"  *AmFin*, 757 F.3d at 532.  Relying on a tax sharing agreement, the *AmFin* trial court determined that the tax refund belonged to the bankrupt parent corporation.  However, in reaching that conclusion, the trial court denied the FDIC's motion to amend its complaint and introduce additional extrinsic evidence of intent beyond the mere terms of the tax sharing agreement.  The Sixth Circuit Court of Appeals reversed and remanded.  The appellate court determined that the tax sharing agreement was ambiguous and extrinsic evidence should have been permitted to establish the parties' intentions.  *Id*. at 534-38.

The Court believes that the *AmFin* decision is distinguishable in several respects.  First, the appellate panel appeared primarily troubled by the trial court's refusal to hear extrinsic evidence of intent regarding a tax sharing agreement that was ambiguous.  But that is not the present case.  Both the Trustee and the FDIC contend that the TAA is unambiguous.  The Court agrees.  And, the FDIC has not sought to introduce any additional extrinsic evidence of intent.  So, the problematic

evidentiary issue that animates the entire *AmFin* decision is absent in this case. Second, in *AmFin* the FDIC directly presented a resulting trust argument. That argument also depended on extrinsic evidence which had been barred. In this case, the FDIC has not raised expressly a resulting trust argument necessitating additional evidence. Finally, the Court also notes that the *AmFin* decision is not binding precedent in this jurisdiction. Under the circumstances, and also because the Sixth Circuit Court of Appeals did not directly address the central bankruptcy issues (Section 541 is not even mentioned), the Court believes that *AmFin* is not especially persuasive.

**C.      The Trustee Is Entitled to a Declaration that the Tax Refund Is Property of the UW Bancorp Bankruptcy Estate.**

In the Complaint, the Trustee requested a declaration (under Section 541 and 28 U.S.C. 2201) that the Tax Refund is property of the UW Bancorp bankruptcy estate. Based upon the foregoing, the Trustee is entitled to such declaration. Further, the FDIC is not entitled to the declaration that it requested through its mirror-image counterclaim.

**D.      The Trustee's Turnover Claim Is Moot.**

In the Complaint, the Trustee requested an order directing the FDIC to turn over the Tax Refund to the Trustee under 11 U.S.C. § 542. But, it is now undisputed that the FDIC does not have possession of the Tax Refund. Instead, the Tax Refund is in the Registry of this Court pending the Court's adjudication of the issues. Accordingly, the Trustee's Section 542 claim is moot.

**E.      The Trustee's Objection to the FDIC Claim Is Sustained.**

Through the FDIC Claim, the FDIC originally claimed four categories of amounts allegedly owed by UW Bancorp to the FDIC: (1) Section B asserted "tax-related claims"; (2) Section C asserted "fraudulent transfers/unlawful dividends"; (3) Section D asserted entitlement to "insurance proceeds"; and (4) Section E asserted "other claims." FDIC Claim at 3-7.[29] Thereafter, the FDIC withdrew its claims asserted in Section C, D, and E of the FDIC Claim. (Docket No. 53.) So, the only remaining claim asserted in the FDIC Claim is Section B "tax related claims."

Section B of the FDIC Claim states:

> The FDIC Receiver asserts claims arising from consolidated tax
> returns filed by UWB [UW Bancorp] on behalf of . . . United
> Western Bank [the Bank] and for tax related intercompany balances
> held by the Debtor, including those that may have arisen under law
> or pursuant to any tax allocation agreement or tax sharing agreement

---

[29]      The FDIC Claim also included Section A ("introduction") and Section F ("reservation of rights"). In Section A, the FDIC primarily asserted this Court's alleged lack of subject matter jurisdiction to adjudicate issues relating to the FDIC Claim. FDIC Claim at 1-3. Subsequently the FDIC withdrew its jurisdictional defenses in this Adversary Proceeding and stated: "The FDIC-Receiver consents to entry of final orders or judgment by the Bankruptcy Court in this adversary proceeding." (Docket No. 53.) Furthermore, the Court also has determined that it has jurisdiction to adjudicate the matters framed by the Complaint and Answer. Accordingly, Section A is of no remaining moment. And Section F only purports to make reservations, not assert separate claims.

> between United Western Bank and UWB . . . .  In filing tax returns
> and receiving tax refunds and other tax payments, the Debtor acts as
> agent and fiduciary for United Western Bank.
>
> The FDIC-Receiver asserts claims arising from tax returns filed by
> UWB on behalf of United Western Bank and for tax related
> intercompany balances held by UWB in an amount of approximately
> $4,847,000.  In filing tax returns and receiving tax refunds and other
> tax payments, UWB acts as agent and fiduciary for United Western
> Bank.  These refunds are owned by United Western Bank and are not
> assets of UWB.  As such, United Western Bank's entitlement to such
> refunds is based on an ownership interest rather than as a claim
> against UWB.  Alternatively, to the extent that United Western
> Bank's asserted right to such refunds is determined to be a claim
> against UWB, then United Western Bank does hereby assert a claim
> against UWB on account of any such refunds.

Through the Complaint, the Trustee objected to Section B of the FDIC Claim, except "to the extent that it presents a non-priority, general unsecured pre-petition claim for all or a portion of the [Tax] Refund."  In other words, with respect to the "tax-related claims," the Trustee's only objection was to the asserted ownership or priority asserted by the FDIC.  Subsequent to both the FDIC Claim and the Complaint, the IRS deposited the Tax Refund in the amount of $4,081,335 (which amount is somewhat less than estimated in both the FDIC Claim and the Complaint).

After careful review of the FDIC Claim, the Court believes that the FDIC asserted entitlement to the full amount of any tax refund which ultimately would be returned by the IRS in relation to the consolidated federal income tax returns of the Affiliated Group.  That amount now has been determined to be $4,081,335.  And, the Trustee did not object to the dollar amount of the FDIC Claim.  Instead, the Trustee only asserted that the Tax Refund belonged to the UW Bancorp estate while conceding that the FDIC should be permitted a non-priority general unsecured claim for the Tax Refund.

Based upon the foregoing, the Court sustains the Trustee's objection to the priority of the FDIC Claim.  The FDIC Claim shall be allowed in the amount of $4,081,335 as a non-priority, general unsecured claim against the UW Bancorp bankruptcy estate.

## VII.   Conclusion.

The IRS issued a $4,081,335 Tax Refund as a result of net operating loss carrybacks generated by the operations of the Bank and offset against prior income in consolidated federal income tax returns filed by UW Bancorp.  The Tax Refund is in the Court's Registry.  This difficult case required the Court to identify the owner of the Tax Refund within the framework of Section 541:  the Trustee or the FDIC.  The Court has determined that the Trustee established a legal interest in the Tax Refund.  However, the FDIC did not meet its burden to prove that the FDIC (not the Trustee) had the beneficial or equitable interest in the tax refund.  Accordingly, the Court determines that the Trustee is entitled to the Tax Refund.  But, this does not leave the FDIC without a remedy.

The FDIC still is a general unsecured creditor of the UW Bancorp bankruptcy estate and may share *pari passu* with any other allowed general unsecured claims.

In light of the foregoing, the Court:

ORDERS that the FDIC's Motion for Summary Judgment (Docket No. 39) is DENIED;

FURTHER ORDERS that the Trustee's Motion for Summary Judgment (Docket No. 44) is GRANTED;

FURTHER ORDERS and DECLARES that the Tax Refund, along with accrued interest, if any, is property of the UW Bancorp estate; and

FURTHER ORDERS that the Trustee's objection to the FDIC Claim is SUSTAINED.  The FDIC Claim shall only be allowed as a non-priority, general unsecured claim in the amount of $4,081,335; and

FURTHER ORDERS that the Trustee's Section 542 claim for turnover is MOOT; and

FURTHER ORDERS that Judgment shall enter in favor of the Trustee and against the FDIC in accordance with this Opinion and Order; and

FURTHER ORDERS that in the absence of an appeal of this Opinion and Order and the entry of a stay pending that appeal, upon proper application by the Trustee, the Court may enter an Order directing the Clerk of the Court to disburse the Tax Refund amount deposited in the Registry of the Court, along with accrued interest, if any, to the Trustee.

DATED: September 16, 2016

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge